UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

PAYCARGO, LLC,

    Plaintiff,

v.

CARGOSPRINT LLC, and
JOSHUA WOLF,

    Defendants.
_____/

CASE NO.: 1:19-cv-22995-LFL

**PAYCARGO, LLC'S MOTION TO
EXCLUDE TESTIMONY OF EXPERT JOHN G. PLUMPE**

1

Plaintiff PayCargo, LLC, pursuant to Rule 702 of the Federal Rules of Civil Procedure, respectfully moves this Court to exclude the expert opinions of John G. Plumpe on behalf of the Defendants on the subject of disgorgement of Defendants' profits as a remedy for trademark infringement, because those opinions are the product of unreliable methods, and unreliable purported evidence.

I.  **INTRODUCTION**

The overall import of Mr. Plumpe's opinions is twofold: (1) with only a few exceptions, he opines that all operating expenses should be deducted from the Defendants' revenue in the first stage of calculating the profit subject to disgorgement, and (2) Defendants' resulting low profit figure should be further reduced, apportioned to reflect his unsupported conclusion that the revenue was attributed to numerous causes other than Defendants' use of the PayAirCargo name. Neither his methodology nor the purported evidence underlying his opinions are reliable.

The record supporting Mr. Plumpe's opinions leans heavily on oral, unrecorded, unsworn representations made to him by the Defendant Joshua Wolf and other CargoSprint management-level employees. Mr. Plumpe did not verify Mr. Wolf's or other CargoSprint management's representations with any supporting documentation, even though documents were available to the Defendants. Indeed, Mr. Plumpe formed his opening opinion without even having all of Defendants' deposition transcripts. When these same individuals told Mr. Plumpe that the purported needs and preferences of the payers and vendors who use these services were the "real" reasons they did business with Defendants, Mr. Plumpe simply accepted Defendants' unsupported opinions, and did not speak to a single payer or vendor to verify Defendants' representations.

Even when Defendants offered data to support their purported expenses, Mr. Plumpe did not take any steps to verify the accuracy or completeness of that data. [REDACTED]

2

In short, Mr. Plumpe is not an independent expert. He is a mouthpiece for Defendants' unsupported claims, parroting Defendants' version of why they obtained customers, Defendants' version of deductible costs and expenses, and then running Defendants' "facts" and data created for this litigation through multiple spreadsheets to make Defendants' wish list of conclusions appear valid. They are not, and this Court must not allow Mr. Plumpe's testimony to make them appear so.

## II. BACKGROUND AND SUMMARY OF OPINIONS

PayCargo seeks a disgorgement of Defendants' profits from their trademark infringement, pursuant to 15 U.S.C. § 1117(a). "The Lanham act provides that a 'defendant [in a disgorgement of profits analysis] must prove all elements of cost or deduction claimed.'" *Burger King Corp. v. Mason*, 855 F.2d 779, 783 (11th Cir. 1988) (quoting 15 U.S.C. § 1117). Defendants thus engaged Mr. Plumpe to provide an opinion as to Defendants' allowable costs and other deductions.

Mr. Plumpe offered opinions addressing both the "elements of cost" Defendants claim should be deducted from their sales: (1) Defendants' deductible costs and expenses and (2) further deductions based on alternative revenue attribution and profit apportionment calculations. His opinions are included in his expert report, Expert Report of John G. Plumpe, attached as **Exhibit A**, in his rebuttal report, Rebuttal Expert Report of John G. Plumpe, attached as **Exhibit B**, and in his deposition, Plumple Dep. Tr., relevant portions attached as **Exhibit C**. PayCargo offered two rebuttal reports to Mr. Plumpe's original report—one by CPA Barry Mukamal addressing Mr. Plumpe's claimed allowable cost deductions, attached as **Exhibit D**, and another by economist Daniel Cenatempo addressing Mr. Plumpe's attribution and apportionment deductions, attached as **Exhibit E**.

### A. Summary of Mr. Plumpe's Opinions on Incremental Operating Profits

Mr. Plumpe ████████████████████████████████████████

████████████████████████████████████████████████████████

████████

---

[1] Incremental profits are the profits tied to the infringing activities. See *PODS Enterprises, LLC v. U-Haul Int'l, Inc.*, 126 F. Supp. 3d 1263, 1281 (M.D. Fla. 2015) (expert testified that U–Haul made $34–48 million in incremental profits attributable to increased search engine traffic directed to its website, after making deductions from gross sales).



See M. Del Rayo Torres Wolf Dep., Jan. 26, 2021 at 111:6-9, attached as **Exhibit G**.



Ex. D, Mukamal Rebuttal Report, internal Exhibit 2.

*See* CargoSprint 30(b)(6) J. Wolf Dep. January 12, 2021 at 21:1-13, attached as **Exhibit H.**

### B. Summary of Opinion on Revenue Attribution and Profit Apportionment

Mr. Plumpe also considered whether the evidence in this case, including Defendants' documents and data, indicates that further deductions should be made from the gross revenue figure calculated by PayCargo, based on the portion of CargoSprint's revenues and profits that are not attributable to Defendants' use of the name "PayAirCargo." Ex. A, Plumpe Report at 9. He did the following things without having sufficient evidentiary basis for doing so, relying on oral discussions with Defendant Wolf and two other managers of CargoSprint without verifying their representations.

---

[2] Maria Del Rayo Torres Wolf also uses a shortened version of her name, "Rayo Torres." Ex. G, M. Del Rayo Torres Wolf Dep. at 7:5-9.

      1. <u>Identified Other Revenue Factors</u>: Mr. Plumpe reviewed case deposition testimony and had discussions with CargoSprint personnel to identify factors "that contribute to the use of CargoSprint's payment processing system and how CargoSprint generates handling fees that are unrelated to the name of the company." *Id.* at 30-33. He provided a list of "examples" of these factors. *Id.* at 31.

      2. <u>"Before-and-After" Revenue Analysis</u>: Mr. Plumpe reviewed CargoSprint's net revenues and handling fees for the period from June 19, 2013 through November 12, 2020. *Id*. at 22. He identified January 1, 2017, as the date before which CargoSprint used the name PayAirCargo and after which, per Mr. Plumpe, it "significantly reduced" the use of the name PayAirCargo. *Id.* at 29-30. He did not attempt to quantify CargoSprint's use of the name PayAirCargo, such as on invoices, after January 1, 2017. Ex. C, Plumpe Dep. at 82:4–85:12. Mr. Plumpe then compared CargoSprint's revenue, handling fees, number of transactions, and number of unique vendors and payers before and after January 1, 2017. Ex. A, Plumpe Report at 33-39. He found that CargoSprint's volume was greater after January 1, 2017 for each of these indicators. *Id.*

      3. <u>Highlighted Purported Differences Between PayCargo and CargoSprint</u>: Mr. Plumpe highlighted what he described as "significant differences between CargoSprint's and PayCargo's service offerings and payment processing methods offered, as well as the differences in customers and cargo facilities." *Id.* at 6, 39-40, 44, and 74-76.



*Id*. at 42-43, 82-84 and Tab 3.

      Based on the preceding, Mr. Plumpe concluded the following:



c. "The same lack of evidence exists for new CargoSprint payers … There is not evidence to suggest that CargoSprint gained those payers due to any economic goodwill in or association with PayCargo Marks." *Id.*

d. "… there is no evidence that CargoSprint benefited from the use of the name PayAirCargo." *Id.* at 42.

e. "Therefore, my analysis of CargoSprint's transaction data and the record in this case do not indicate that any revenue or profit generated by CargoSprint after December 31, 2016 can be attributed to the Defendant's alleged use of the name PayAirCargo." *Id.*

f. Similarly, prior to January 1, 2017, the evidence suggests that CargoSprint's revenues and acquisition of payers and vendors was due to factors other than the use of the PayAirCargo name, particularly the methods of payments accepted and used for payment remittance." *Id.*

**III.    Argument**

    **A.    Requirements for Admissibility of Expert Testimony**

Rule 702 of the Federal Rules of Evidence permits expert testimony by "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education" if four criteria are met:  "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. The Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), "requires the trial court to act as a gatekeeper to insure that speculative and unreliable opinions do not reach the jury." *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1237 (11th Cir. 2005); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 138 (1999) (extending *Daubert* to all proffered expert testimony, regardless of whether it qualifies as traditionally "scientific" in

nature). "The importance of *Daubert*'s gatekeeping requirement cannot be overstated." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc); *see also McClain*, 401 F.3d at 1238 ("A trial court . . . abuses its discretion by failing to act as a gatekeeper.").

Even in bench trials, the court still must perform this gatekeeping function and apply the *Daubert* principles to proffered expert testimony when such testimony is challenged as inadmissible under Rule 702. *United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005). Where there is no jury, a court has more discretion to admit testimony because there is not the same threat of "dumping a barrage of questionable scientific evidence on a jury." *Id.* At the same time, granting the trial court leeway in a bench trial "is not the same thing as abdicating . . . responsibility," and failing to make a *Daubert* analysis is reversible error when it affects the outcome of a trial. *Id.*, 415 F.3d at 1266. *See also Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 760 (7th Cir. 2010)(holding *Daubert*'s requirements of reliability and relevancy continue to apply in a bench trial); *Attorney Gen. of Okla. v. Tyson Foods, Inc.,* 565 F.3d 769, 779 (10th Cir. 2009)(same); *Seaboard Lumber Co. v. United States,* 308 F.3d 1283, 1302 (Fed. Cir. 2002)(same); *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000)(same).

In the Eleventh Circuit, the *Daubert* analysis requires courts to engage in a "rigorous three-part inquiry" to determine if proposed expert testimony is admissible:

> (1) the expert is qualified to testify competently regarding the matters he intends to address;
> (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and
> (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Hendrix, ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1184 (11th Cir. 2010). The party submitting the evidence bears a "substantial" burden to establish the admissibility of its experts by a preponderance of the evidence. *Cook ex rel. Tessier v. Sheriff of Monroe Cty., Fla.*, 402 F.3d 1092, 1107 (11th Cir. 2005).

The Supreme Court has provided non-exhaustive, flexible factors for courts to consider in evaluating whether a purported expert's opinion is based on valid methodology and can be reliably applied to the facts of the case. These factors are:

- Whether the expert's theory and methodology can be or have been tested;
- The known or potential error rates for a particular technique;

- Whether the expert's theory and methodology have been subjected to peer-review or publication;
- Any standards and controls applicable to the science;
- The degree of acceptance in the relevant scientific or expert community.

*Daubert*, 509 U.S. at 593–94; *see also Kumho Tire*, 526 U.S. at 141.

  Mr. Plumpe's opinions are defective under Rule 702 because he failed to use either sufficient facts and data or a reliable methodology, or both. Without a reliable methodology, the Court would simply be asked to "tak[e] the expert's word for it," which is insufficient for admissibility. Fed. R. Evid. 702, Advisory Committee Notes (2000 Amendment). "[I]t is [vital] that judges not be deceived by the assertions of experts who offer credentials rather than analysis." *Minasian v. Standard Chartered Bank, PLC*, 109 F.3d 1212, 1216 (7th Cir. 1997). "[T]he absence of scientific principles in [an expert's] methodology deprives [the expert's] opinion of the reliability necessary for admission in evidence" because "[i]n order to be admissible, an expert's testimony must be based on 'more than subjective belief or unsupported speculation.'" *Haggerty v. Upjohn Co.*, 950 F. Supp. 1160, 1167 (S.D. Fla. 1996), aff'd, 158 F.3d 588 (11th Cir. 1998).

  **B. Mr. Plumpe's Opinion on Revenue Attribution and Profit Apportionment is Not Supported by a Reliable Methodology Because He is Serving as a Mouthpiece for the Defendants' Opinions Without any Independent Verification**

  Applying these factors to Mr. Plumpe's testimony confirms that his revenue attribution and profit apportionment methodology is not reliable, and the purported facts underlying his opinion are nothing more than the unverified assertions of the Defendants themselves. His unfounded opinion must be excluded.

  As noted above, Mr. Plumpe concluded that, assuming Defendants infringed PayCargo's trademark, there were multiple factors other than the trademark that led to the profit earned by PayAirCargo/CargoSprint. A similar position was excluded in the case of *Hi Ltd. Partnership v. Winghouse of Florida, Inc.*, 2004 WL 5486964 (M.D. Fla. 2004). In the *Winghouse* case, the court concluded there "appears to be no real methodology underlying the process he used to select the particular range of 0–10%. In other words, the opinion is highly speculative and unreliable. More particularly, there is no indication whatsoever from the record before this Court that the "technique" Mr. Murphy employed in arriving at his opinion "can be and has been tested; ... has

9

been subjected to peer review and publication; ... and ... is generally accepted in the scientific community."

██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████ Ex. A, Plumpe Report at 30-31. Mr. Plumpe continued, stating that "I understand that these and others factors contribute to CargoSprint's payment processing services and the generation of handling fees, and are unrelated to the alleged use of the PayAirCargo name." *Id*. at 32. He identified other factors that he "understand[s]" to be significant, such as the fact that "the decision-making process of payers and vendors when choosing a payment processing service does not include consideration of the name because most of the payers and vendors are sophisticated companies that are looking for the best way to get cargo released." *Id*. The report proceeds to summarize numerous purported reasons for vendor selection that are not tied to the name of the company. But none of the evidence cited comes from a single customer of CargoSprint; all of it comes from the owners and managers of PayAirCargo/CargoSprint, and most of that is from unsworn "discussions" with those same persons. Ex. A, Plumpe Report at 32 n.112-116. There were no recordings, memoranda or even handwritten notes made to memorialize these discussions. Ex. C, Plumpe Dep. at 64:17-65:7. Mr. Plumpe is not aware of any steps taken to ensure that his reporting of these discussions was accurate before submitting his reports. *Id*. at 66:14-67:2.

Mr. Plumpe cites one case in support of this methodology: *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 72 (2d Cir. 1998). But this case did not involve any of the factors that Mr. Plumpe applied to this case. It involved only the possibility that the strong Tommy Hilfiger brand also attracted buyers to the product at issue, in addition to Hilfiger's infringing use of the plaintiff's trademark. Furthermore, Hilfiger offered actual sworn testimony by "a buyer for a large chain of department stores, that some portion of the sales of its nautical sportswear line was attributable to the appeal of Hilfiger's well-known mark and reputation." *Id*. By contrast, Mr. Plumpe's opinion is based on a laundry list of factors that is not supported by *any* evidence of actual customer preferences. "[A]n expert cannot forgo his own independent analysis

and rely exclusively on what an interested party tells him." *Orthoflex, Inc. v. ThermoTek, Inc.*, 986 F. Supp. 2d 776, 798–99 (N.D. Tex. Nov. 20, 2013).

Even if the methodology were reliable, the factual claims that underlay his opinion are not. Although his report does cite some documentary evidence and sworn deposition testimony by Defendants' employees, Instead, he relied extensively on "discussions" with principals of CargoSprint: Joshua Wolf, Founder, President and CEO of CargoSprint; Jeffrey Stubblefield, Director of Innovation and Technology at CargoSprint; Carlos Bolaños, Director of Accounting and Finance at CargoSprint, and Rayo Torres Wolf, Chief Operating Officer of CargoSprint. Ex. A, Plumpe Report at 5; Ex. B, Plumpe Rebuttal Report at 5. Indeed, these discussions are cited approximately 40 times in his opening report, and 48 times in his rebuttal report. Most importantly, these discussions provide the only support for key factors in his analysis, where CargoSprint was presumably in possession of records or data that could corroborate the statements of management. Mr. Plumpe never requested those documents, choosing instead not to act as an independent expert, and instead to simply take his client's word for it.

The purported preference of the CargoSprint customers for certain services that Mr. Plumpe claims only CargoSprint could offer provides an example of this defect. *See*, *e.g.*, Ex. A, Plumpe Report at 31, 74 ("[REDACTED] When determining the alleged preferences of the payers and vendors that use the CargoSprint and PayCargo services, neither Mr. Plumpe nor anyone on his team interviewed a single such payer or vendor. Ex. C, Plumpe Dep. at 69:17-23, 70:8-71:20. His "information from payers was indirectly learned through [his] discussions with Mr. Wolf and Mr. Stubblefield." *Id*., 90:22-24.

Mr. Plumpe also used a "before and after" analysis of revenue earned by CargoSprint to argue that the PayAirCargo name had no role in earning that revenue – because revenue grew after January 1, 2017, when CargoSprint's use of the "PayAirCargo" mark was "significantly reduced". Ex. A, Plumpe Report at 29-30. Although this purported significant reduction in the use of the PayAirCargo name was essential to this analysis, he did not attempt to quantify CargoSprint's use of the name PayAirCargo, such as on invoices, after January 1, 2017. Ex. C, Plumpe Dep. at 82:4–85:12. Indeed, much of the record of the use of the PayAirCargo name after January 1, 2017, was found in the Court's orders granting the preliminary injunction and finding Defendants to be in

11

contempt of the injunction. (ECF No. 85 (Preliminary Injunction); ECF No. 120 (Order to Show Cause); ECF 150 (Order on Contempt)).

Despite the importance of these documents in establishing the extent to which Defendants continued to use the PayAirCargo name after the January 1, 2017, before he formed his original opinion Mr. Plumpe never reviewed the Preliminary Injunction, the Order to Show Cause, or the Order on Contempt; none of them appear on the list of Documents Reviewed and Relied Upon in reaching his opening opinion. Ex. A, Plumpe Report Tab 2. Mr. Plumpe admits he never considered the Preliminary Injunction in reaching his conclusions, even though his opinion relies on a purported – and unproven – position that the use of the PayAirCargo name was "significantly reduced" after January 1, 2017. Ex. C, Plumpe Dep. at 42:21-24 ("The Court's actual order is not among the ·documents you listed as something that you reviewed before reaching your opinion; correct? ·A.· ·I believe that's correct.") Indeed, Mr. Plumpe knew that a preliminary injunction hearing had taken place, yet he never obtained the Court's ruling. *Id.*, 42:6-20. As for the contempt motions, he also did not have the Order to Show Cause or the Contempt Order, which discuss uses of the PayAirCargo name that occurred after entry of the Preliminary Injunction, when he reached his original opinion. *Id.*, 44:24–45:8. Nothing in Mr. Plumpe's rebuttal report changes his conclusion that Defendants had "significantly reduced" use of the PayAirCargo name after January 1, 2017. Compare Ex. A, Plumpe Report at 29-30 to Ex. B, Plumpe Rebuttal Report.

Mr. Plumpe's extensive reliance on the oral representations of Defendants and their employees becomes more troublesome when one discovers that he reached his opening opinion without having copies of *four* depositions of individuals whom he interviewed – Joshua Wolf, Rayo Torres Wolf, and Jeff Stubblefield. Ex. B, Plumpe Rebuttal Report Tab 2 at 60 (listing "Documents Reviewed and Relied Upon After the February 5, 2021 Expert Report of John G. Plumpe".) Mr. Plumpe could not explain why he had not received those four depositions before he reached his original opinion. Ex. C, Plumpe Dep. at 46:20-24. Apparently it never occurred to him that the company management employees who provided virtually all of the information he relief on could have given deposition testimony that contradicted their oral representations.

In *Companhia Energetica Potiguar v. Caterpillar Inc.*, the court struck a plaintiff's expert opinion which concluded 62 machines failed "based primarily on photographs and superficial descriptions of a handful of engines." *Companhia Energetica Potiguar v. Caterpillar Inc.*, 14-CV-24277, 2016 WL 7507848, at *8 (S.D. Fla. Aug. 1, 2016). The court took particular issue with the

12

fact that the expert "blindly relied" on information from the plaintiff "without doing his own independent investigation." *Id.* As the court explained, "experts cannot act as the 'mouthpiece of the witnesses on whose statements ... the expert purports to base his opinion.'" *Id.*, quoting *Loeffel Steel Prods. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 808 (N.D. Ill. 2005).

Because "Rule 702 requires expert opinions to be based on 'sufficient facts or data' …. [t]hese opinions should not parrot a litigating party's testimony without independent review or analysis." *Rossi v. Darden*, 16-21199-CIV, 2017 WL 2129429, at *9 (S.D. Fla. May 17, 2017). "[A]n expert's proffered opinion that merely parrots information provided to her by a party is generally excluded." *State Farm Fire & Cas. Co. v. Electrolux Home Products, Inc.*, 980 F. Supp. 2d 1031, 1048 (N.D. Ind. 2013); *see also Kia v. Imaging Scis. Intern., Inc.*, CIV.A 08-5611, 2010 WL 3431745, at *5 (E.D. Pa. Aug. 30, 2010) ("a party may not 'filter fact evidence and testimony through [his] expert merely to lend credence to the same' nor may expert testimony 'be used merely to repeat or summarize what the jury independently has the ability to understand.'"); *Stinson Air Ctr., LLC v. XL Specialty Ins. Co.*, CIV. SA-03-CA-61-FB, 2005 WL 5979096, at *3 (W.D. Tex. July 8, 2005) ("Because the opinions given are based solely upon representations of a party with an interest in the outcome of this lawsuit, without any independent review of ordinary sources of financial analysis, this Court finds Mr. Finch's methodology for formulating an expert opinion to be unorthodox and unreliable."). Likewise, "[p]roffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *United States v. Frazier*, 387 F.3d 1244, 1262–63 (11th Cir. 2004).

In *Black & Decker v. Bosch Tools*, the court struck an expert whose opinion was based on a "study" which was merely based on the "anecdotal" reports conveyed to an expert by an employee of the party said expert was testifying on behalf of. *Black & Decker v. Bosch Tools*, 04 C 7955, 2006 WL 5156873, at *1 (N.D. Ill. Sept. 8, 2006). The expert testified that she did not know if this employee's "study" "was scientific or whether he used a methodology in making his assessment and admitted that Cole's information was anecdotal." *Id.* The expert "further admitted that she did not independently verify any documents to confirm what Cole [the employee] said, but instead relied upon his statements." *Id.* The court excluded this opinion as "not reliable because it is not based on sufficient, relevant data." *Id.* at *2.

The purported revenue attribution and profit apportionment opinion of Mr. Plumpe is not supported by a reliable methodology, or by reliable evidence. He is simply repeating the unverified

13

assumptions and representations of the parties that engaged him and dressing them up in something that purports to be a data-driven analysis. This Court should exclude this opinion.

      **C.**    **Mr. Plumpe's Testimony on Costs to be Deducted Also Should Be Excluded Because it is Not Supported by a Reliable Methodology or Evidence, But Only by the Defendants' Opinions Without any Independent Verification**

Like the attribution and apportionment opinion, Mr. Plumpe's deductions for Claimed Operating Expenses are overstated and flawed because they are supported only by Defendants' assertions, which Mr. Plumpe did not verify. There is no evidence that Mr. Plumpe reviewed transaction detail underlying each Claimed Operating Expense category to determine what portion, if any, of such expenses may be attributable to infringing revenues. Instead, Mr. Plumpe simply assumed that all but a small portion of Claimed Operating Expenses incurred by Defendants throughout the period, were expenses that were incurred to generate infringing revenues.

First, Mr. Plumpe should not have deducted fixed or overhead expenses that he could not directly attribute to infringing revenues. For example, advertising and marketing costs are generally considered overhead costs, and Mr. Plumpe has not related them to the production of specific revenues. Ex. D, Mukamal Rebuttal Report at 6. There is no support for Mr. Plumpe's implied assumptions that advertising costs are directly attributable to infringing revenues, and no evidence has been presented to indicate that such expenses would not have been incurred but for the infringed revenues.

Second, Mr. Plumpe did not ensure that all expenses were incurred in connection with only the SprintPay business, as opposed to other business activities related to SprintPass and the Accelerated customer business relationship. [REDACTED]

██████████████████████████████████████████████ Ex. G, M. Del Rayo Torres Wolf Dep. at 111:6-9. ██████████████████████████████████████████████ Ex. B, Plumpe Rebuttal Report Tab 2 at 61-63. ██████████████████████████████████████████████ Ex. D, Mukamal Rebuttal Report at 11-12. ██████████████████████████████████████████████ f

---

[3] ██████████████████████████████████████████████



Ex. D, Mukamal Rebuttal Report at 5-6.

Ex. D, Mukamal Rebuttal Report at 12.

In sum, Mr. Plumpe's handling of the expenses to be claimed was not professionally reasonable. Experts cannot reasonably rely on data "prepared exclusively for litigation." *Minemyer v. B-Roc Representatives, Inc.*, 07 C 1763, 2009 WL 3757378, at *7 (N.D. Ill. Oct. 29, 2009); *see also In re H & M Oil & Gas, LLC*, 511 B.R. 408, 421–22 (Bankr. N.D. Tex. 2014) (expert cannot reasonably rely on valuation reports without independently verifying the accuracy of those reports). The profit and loss reports prepared for litigation omitted important expense details that, had Mr. Plumpe seen them, should have led him to exclude them from his allowable costs when calculating Defendants' Claimed Operating Expenses. Furthermore, by failing to perform an "independent review of ordinary sources of financial analysis" when analyzing the expenses Defendants wanted to claim, Mr. Plumpe rendered his own opinion unreliable. *Stinson Air Ctr., LLC.*, CIV. SA-03-CA-61-FB, 2005 WL 5979096, at *3.

## IV.    CONCLUSION

Defendants' expert should not be permitted to testify as to his opinions in this matter. He did not use reliable methodology or reliable evidence. When concluding that little to no profit should be attributed to the Defendants' use of the infringing PayAirCargo name, he relied solely on unsworn, unrecorded interviews with Defendant Joshua Wolf and other managers of CargoSprint to support key facts. When he did rely on documents and data, he did not take the necessary steps to verify the accuracy of the CargoSprint records on which he relied. In sum, he

did not function as an independent expert; instead, he simply repeated what the Defendants told him. This is too slim a reed to support his conclusions.

## **CERTIFICATE OF GOOD FAITH CONFERRAL**

In compliance with S.D. Fla. L.R. 7.1(a)(3), the Parties conferred via email regarding the relief sought herein and Defendants oppose said relief.

Respectfully submitted,

EVERSHEDS SUTHERLAND (US) LLP
Ann G. Fort (admitted *pro hac vice*)
999 Peachtree St. NE, Suite 2300
Atlanta, GA 30309
Phone: 404-853-8000
Facsimile: 404-853-8806
Email: annfort@eversheds-sutherland.com
Cameron C. Murphy
Florida Bar No. 0125086
999 Peachtree St. NE, Suite 2300
Atlanta, GA 30309
Phone: 404-853-8000
Facsimile: 404-853-8806
Email: cameronmurphy@eversheds-sutherland.us


PODHURST ORSECK, P.A.

SunTrust International Center
One S.E. 3rd Avenue, Suite 2300
Miami, Florida 33131
Telephone: (305) 358-2800
Facsimile: (305) 358-2382
Peter Prieto
Florida Bar No. 501492
pprieto@podhurst.com
Matthew Weinshall
Florida Bar No. 84783
mweinshall@podhurst.com
Alissa Del Riego
Florida Bar No. 99742
adelriego@podhurst.com

XANDER LAW GROUP, P.A.

By:<u>*/s/Wayne R. Atkins*</u>
    Wayne R. Atkins
    Florida Bar No. 84000
One NE 2nd Avenue, Suite 200
Miami, FL 33132
Phone: 305-767-2001
Facsimile: 855-926-3370
Email: wayne@xanderlaw.com

***Counsel for PayCargo, LLC***

## CERTIFICATE OF SERVICE

I HERBY CERTIFY that on April 23, 2021, a true and correct copy of the foregoing document was served electronically to all parties of record.

By  <u>*/s/Wayne R. Atkins*</u>
    Wayne R. Atkins
