UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

PAYCARGO, LLC,

    Plaintiff,

v.

CARGOSPRINT LLC, and
JOSHUA WOLF,

    Defendants.
_____/

CASE NO.: 1:19-cv-22995-LFL

**PAYCARGO, LLC'S REPLY IN SUPPORT OF ITS MOTION
TO EXCLUDE TESTIMONY OF EXPERT JOHN G. PLUMPE**

PayCargo, LLC files its Reply in Support of its Motion to Exclude Testimony of Expert John G. Plumpe (ECF No. 187):

Mr. Plumpe's opinion attempts to rebut PayCargo's calculation of the profits that should be disgorged from the Defendants as a remedy for their infringement of the PayCargo trademarks. He deducted costs from revenues to calculate an operating profit, and then he performed a purported revenue attribution and profit apportionment analysis, to reduce the share of the CargoSprint operating profit that is subject to disgorgement. PayCargo moved to exclude these opinions because they do not satisfy the *Daubert* requirement of reliable methodology and reliable evidence.

Defendants' brief contains some overheated rhetoric accusing PayCargo of various misrepresentations concerning the opinions of their remedies expert. As discussed below, PayCargo stands by its assessment of Mr. Plumpe's opinions as a factual matter. Behind that rhetoric Defendants make two main substantive arguments: (1) there is nothing wrong with Mr. Plumpe's reliance on uncorroborated oral discussions with CargoSprint's owners and management employees, including Defendant Josh Wolf, as the only source for customer preference and other information that is core to his revenue attribution opinion, and (2) his calculation of apportioned profits deriving from that revenue attribution opinion is reliable, even though it is based on a generalized list of unquantified alleged attribution factors. They are incorrect on both points.

While there is authority allowing for experts to base their opinions on some kinds of hearsay evidence, those cases do not approve an expert's reliance on dozens of oral representations by persons with an interest in the outcome of the case, particularly when those statements purport to provide information concerning third parties, either customers or PayCargo itself, that the expert does not even attempt to verify. This reliance prejudices PayCargo because these statements are the source of Mr. Plumpe's revenue attribution opinion: that a multitude of factors other than the infringing trademark were the source of CargoSprint's revenue. Based on this generalized list of attribution factors, Mr. Plumpe then conducted a calculation that purports to apportion CargoSprint's operating profit, resulting in a specific profit figure. But neither his reports nor the Defendants' brief cite any authority endorsing the specific calculation he performed. For these reasons and the reasons in PayCargo's original motion, this Court should exclude Mr. Plumpe's opinions.

1

## I. PayCargo Accurately Summarized Mr. Plumpe's Opinions and Their Basis

### A. Mr. Plumpe Did Include the Vast Majority of CargoSprint's Expenses When Calculating His Operating Profit Figure

Defendants' theme for their opposition brief is to engage in overheated rhetoric accusing PayCargo of misrepresenting Mr. Plumpe's opinions. (ECF No. 187 at 1-10.) (Those opinions are found primarily in his two reports, the Expert Report of John G. Plumpe, attached as **Exhibit A**, and the Rebuttal Expert Report of John G. Plumpe, attached as **Exhibit B**). Defendants claim that, for example, PayCargo did not take Mr. Plumpe's Rebuttal Report re-calculation of allowable expenses into account when criticizing the various operating costs Mr. Plumpe included in his calculation of Defendants' operating profit. *Id.* at 5. Even taking that revised calculation into account, however, the impact of Mr. Plumpe's decisions remains clear: He has concluded that a total of ███████████████████████████████████████████████████████████████████████

████████████████████████████████████████ Ex. A Plumpe Rebuttal Report Tab 3a. █

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ Mukamal Partial Rebuttal to the Expert Report of John G. Plumpe, attached as **Exhibit C**, at Tab 4 (Reconciliation of Operating Costs Claimed by Plumpe to Operational Costs Acknowledged by Mukamal for 2013 – 2019).

Clearly there is a significant difference between the operating costs allowed in PayCargo's profit calculation and in the Defendants' calculation, a difference caused by a simple fact: even after following Mr. Mukamal's lead and disallowing several categories of expenses,[1] Mr. Plumpe continued to deduct other categories of expenses that he should not have accepted as direct operating expenses. The expenses he did allow above those allowed by PayCargo's expert either were not supported with reliable evidence, or the evidence established that they did not fit the direct expense category. *See* **Exhibit C** at 6-8. ████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████. *Id.* Similarly, the

---

[1] Per Defendants' brief, the Rebuttal Report ████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████ (ECF No. 187 at 5-6.)

2

expenses paid to Defendant Wolf's mother-in-law remain questionable because of her close insider status, in addition to the fact that those expenses have not been allocated to the SprintPay business activity. *Id.* at 8-9. Mr. Plumpe's decision to allow expenses that were not clearly allocated to the SprintPay business unit is particularly problematic because Defendants admit that CargoSprint was incurring expenses for business activity was being conducted, including the development of SprintPass, and "███████████████████████████████████." (ECF No. 187 at 6.)

### B. Mr. Plumpe Did Rely on Discussions with CargoSprint's Owners and Managers to Support Dozens of Facts at the Heart of His Opinions.

Defendants contend that PayCargo has overstated the extent of Mr. Plumpe's reliance on discussions with CargoSprint's owners, Josh Wolf and Rayo Torres Wolf, and CargoSprint management employees, Jeff Stubblefield (Director of Innovation and Technology) and Carlos Bolaños (Director of Accounting and Finance). (ECF No. 187 at 9-10.) Here are the facts: Mr. Plumpe cited "discussions with" one or more of these insiders as the source of literally dozens of facts that are at the heart of his opinions. See Table, Plumpe Reliance on Discussions With CargoSprint Owners & Management, attached as **Exhibit D**. These statements address three main categories of information: (1) PayCargo's business practices, (2) customer preferences, and (3) CargoSprint's business practices. For example:



PayCargo and Defendants clearly disagree about whether it was appropriate for Mr. Plumpe to rely on the mere say-so of biased owners and employees of the company that has engaged him to present this profit calculation. The extent of his reliance is not a matter of debate, however. The number of times he relied on these discussions is demonstrated in the reports themselves, and summarized in **Exhibit D** to this brief.

3

Defendants also argue that because PayCargo's rebuttal expert, Mr. Cenatempo, relied on discussions with PayCargo management, Defendants' expert has free rein to do the same. (ECF No. 187 at 10.) Yes, Mr. Cenatempo cites such discussions, but only 11 times, compared to at least 75 times for Mr. Plumpe. *Compare* Cenatempo Rebuttal Report attached as **Exhibit E**, at nn. 40, 41, 43, 48, 51, 52, 54, 60, 66, 88, 91, to Exhibit D.

More importantly, a review of the Defendants' citations to support this point (ECF No. 187 at pg. 9-10). reveals key distinctions:

- Three of the cited examples are factual or historical information about PayCargo which PayCargo would have direct knowledge of and which were corroborated by citations to other documents reviewed by Mr. Cenatempo. (ECF No. 187-5 at pg. 18 n.41) (transaction fees charged by PayCargo; corroborated by logistics publication); *Id.* at n.43 (PayCargo charges annual fees; corroborated by PayCargo Terms and Conditions); *Id.* at pg. 31 n.66 (PayCargo's growth in conjunction with growing popularity of electronic payments and relying on relationship with FirstData to reassure customers in start-up stage; corroborated by citation to two other documents).

- Two of the examples are Mr. Cenatempo citing to such discussion in support of what he expressly describes as PayCargo's "belief" about its own service and which are followed by statements where Mr. Cenatempo expressly disclaims drawing any conclusions from that belief. (ECF No. 187-5 at pg. 17 n.40 ("PayCargo believes it has a better overall reputation than CargoSprint. However, I have not seen evidence that allows me to draw a conclusion on the relative reputations of the two companies."); *Id.* at pg. 21 n.52 ("PayCargo believes that its system is more customizable than CargoSprint's. However, I have not seen evidence that allows me to draw a conclusion based on the two companies' customizations.").

- Three of the examples are followed by an analysis of how Mr. Cenatempo confirmed those discussions with PayCargo. (ECF No. 187-5 at pg. 21 n.54) (PayCargo's belief about its faster overall cargo release speed confirmed by examples analyzed in subsequent footnotes); *Id.* at pg. 25 n.60 (PayCargo's belief about U.S. import and export cargo was "consistent with Mr. Plumpe's discussion of CargoSprint's business" as well as Mr. Cenatempo's review of U.S. cargo trade

4

on following page with citations to "TABLE-1 and FIGURES-1 and -2 for more details."); *Id.* at pg. 44, n.91 (PayCargo's estimate of customer overlap confirmed by subsequent analysis of customer lists by Mr. Cenatempo);

- Three of the examples are simply in support of the forms of payment PayCargo accepts and services it offers. (ECF No. 187-5 at pg. 20 n.48) (forms of payment accepted by PayCargo); *Id.* at pg. 21 n.51 (PayCargo customizes portals and payment technologies for customers; *Id.* at pg. 41 n.88 (forms of payment accepted by PayCargo);

- The last cited example is simply part of a list of materials Mr. Cenatempo relied upon generally and is not cited in support of anything in particular. (ECF No. 187-5 at pg.5).

In other words, these examples were largely corroborated by other sources, were expressly characterized as PayCargo's "belief" while expressly disclaiming any opinion based on those beliefs, or were cited only for services offered by PayCargo which PayCargo would have direct evidence of and which appear to not be disputed by Defendants. This is a far cry from relying upon Defendants' "beliefs" about why customers prefer Defendants over PayCargo. Neither Mr. Plumpe nor Mr. Cenatempo were retained as experts to simply tell the Court their opinion whether they believe PayCargo accepts checks – a factual point which will presumably be established by factual evidence. In contrast, beliefs about customer preferences are at the core of the experts' respective opinions, and Mr. Plumpe's reliance on only the unconfirmed say-so of a party for such a foundational point undermines his entire opinion. As explained in the Motion, an expert cannot simply serve as a means for introducing Defendants' wishful speculation under the guise of expertise.

## II. Mr. Plumpe's Revenue Attribution and Profit Apportionment Opinions Are Not Supported by Reliable Methodology or Reliable Evidence

### A. The Attribution and Apportionment "Methodology" Mr. Plumpe Used Starts With Broad Generalizations, and Ends with A Purported Calculation of Attributed Profit That Lacks Any Indicia of Professional Reliability

Defendants are confusing the *concept* of revenue attribution and profit apportionment with their obligation to use a reliable methodology and quantifiable data to support their claimed attribution factors that result in a purported calculation of apportioned profit. (ECF No. 187 at 11.) PayCargo agrees that the *concept* of attribution and apportionment applies here, as it is set forth in

5

the Lanham Act and the cases interpreting it. PayCargo does not agree, however, that Mr. Plumpe's purported methodology satisfies the requirements of *Daubert* and its progeny. He does not use reliable evidence, and Defendants have not provided any authority, legal or otherwise, supporting the calculations that converted the possible alternative revenue attribution factors into a quantified calculation of profit apportionment – a reduction in operating profits caused by those purported revenue attribution factors.

The Supreme Court has provided non-exhaustive, flexible factors for courts to consider in evaluating whether a purported expert's opinion is based on valid methodology and can be reliably applied to the facts of the case. These factors are:

- Whether the expert's theory and methodology can be or have been tested;
- The known or potential error rates for a particular technique;
- Whether the expert's theory and methodology have been subjected to peer-review or publication;
- Any standards and controls applicable to the science;
- The degree of acceptance in the relevant scientific or expert community.

*Daubert*, 509 U.S. at 593–94; *see also Kumho Tire*, 526 U.S. at 141. These factors were not met when Mr. Plumpe calculated an ultimate figure for apportioned profit:



Plumpe Rebuttal Report at 43.

To support their argument that the Plumpe methodology meets these requirements, Defendants cite *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 208 (1942), and two professional publications. (ECF No. 187 at 11.) None of these authorities provides support for Mr. Plumpe's reliance on biased information, or for his ultimate calculation of the apportioned profit that he believes accurately reflects the purported revenue attribution factors. *Mishawaka Rubber & Woolen Mfg. Co.* – a U.S. Supreme Court case decided before the effective date of the Lanham Act – stand only for the proposition that revenue attribution and profit apportionment are permitted, if the defendant bears the burden of proving them. 316 U.S. at 208.

6

The case does not say how to go about that proof, and therefore does not support Mr. Plumpe's methodology.

Similarly, the professional publications Defendants cite provide only general guidance, at most citing some factors that a defendant might consider when arguing for a reduction of profits to be disgorged, via revenue attribution and profit apportionment. *See American Institute of Certified Public Accountants Practice Aid on Intellectual Property Infringement Damages* ("AICPA")(pursuant to the Lanham Act, "the intellectual property owner shall recover only the net profits of the infringer that are *traceable to the infringement*."); *Litigation Services Handbook: The Role of the Financial Expert*, at 17-18, 6th edition, Edited by Roman L. Weil, Daniel G. Lentz, and Elizabeth A. Evans, John Wiley & Sons. Inc., 2017 ("For example, in a trademark case the infringer might argue that profits resulted from the functional and aesthetic qualities of its product, the quality of the sales force, in addition to or instead of alleged infringing mark.") Defendants do not identify any authority that provides a methodology for converting these possible alternative revenue attribution factors into a quantified calculation of profit apportionment – a reduction in operating profits caused by those purported revenue attribution factors.

Defendants attempt to distinguish the cases PayCargo relied on, including the *Winghouse*, *Orthoflex* and *Tommy Hilfiger* cases. (ECF No. 187 at 12-13.) Those attempts are unavailing, however.  Defendants contend that *Hi Ltd., Partnership v. Winghouse of Florida, Inc.*, No. 6:03-cv-116-Orl-22JGG, 2003 U.S. Dist. LEXIS 30687, 2004 WL 5486964 (M.D. Fla. Oct. 5, 2004) does not apply to Mr. Plumpe's opinion, because "Plumpe did not assign any numerical value or percentage to any of the non-accused factors detailed in either the Plumpe Report or the Plumpe Rebuttal Report. Rather, Plumpe discussed revenue attribution and apportionment conceptually to aid the finder of fact in understanding that multiple assets contribute to CargoSprint's overall business, similar to the portion of the expert's testimony in *Winghouse* that was not excluded." (ECF 187 at 12.) This decision not to quantify the purported contributions made by other factors does not support Mr. Plumpe's ultimate calculation of apportioned profit, however. The court in *Winghouse* excluded the opinion for assigning a percentage value to attribution factors when there was no basis for doing so. 2004 WL 5486964 at *4-*5.

Defendants argue that the *Winghouse* reasoning does not apply to Mr. Plumpe, because he "did not assign any numerical value or percentage to any of the non-accused factors detailed in either the Plumpe Report or the Plumpe Rebuttal Report." (ECF 187 at 12.) But the Winghouse

7

court objected not to the assignment of particular percentages; it objected to doing so when "there appears to be no real methodology underlying the process" leading to those numbers. 2004 WL 5486964 at *4. Defendants do not explain how avoiding assigning any numerical value to these factors can then support a purported calculation of "the resulting portion of CargoSprint's profits associated with those revenues" in a specific amount.

Mr. Plumpe's work still suffers from the same problem found in the *Winghouse* case: "the opinion is highly speculative and unreliable. More particularly, there is no indication whatsoever from the record before this Court that the "technique" Mr. [Plumpe] employed in arriving at his opinion "can be and has been tested; ... has been subjected to peer review and publication; ... and ... is generally accepted in the scientific community." 2004 WL 5486964 at *5.

Defendants' arguments under *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.,* 146 F.3d 66 (2d. Cir. 1998) and *Orthoflex, Inc. v. ThermoTek, Inc.,* 986 F. Supp. 2d 776, 798-99 (N.D. Tex. Nov. 20, 2013)) fare no better. Defendants contend that the *Tommy Hilfiger* case supports Mr. Plumpe's methodology, because the court in *Tommy Hilfiger* acknowledged that factors other than the alleged infringing marks were responsible for defendant's sales. *Tommy Hilfiger,* 146 F.3d at 72. ("…some portion of the sales of its nautical sportswear line was attributable to the appeal of Hilfiger's well-known mark and reputation.") (ECF 187 at 12.) That may be, but there is no support in the case for the next step in Mr. Plumpe's analysis: a purported calculation of "the resulting portion of CargoSprint's profits associated with those revenues" in a specific amount.

Similarly, Defendants argue that in *Orthoflex*, "the expert's testimony was excluded because (1) he was unable to identify the exact methodology he utilized in reaching his conclusions, *Orthoflex,* 986 F. Supp. at 798; and (2) 'he relied exclusively on conversations with plaintiffs' counsel to reach certain opinions in his report.' *Id.* at 797.[2]" (ECF 187 at 12.) Defendants claim that Mr. Plumpe "employed methods commonly used in determining the profits of a defendant attributable to the use of an alleged infringing trademark in Lanham Act cases, namely (a) deducting costs that were necessary for the generation of revenues accused by the plaintiff to be infringing and (b) conducting an apportionment analysis." *Id*. at 12-13. Again, this statement

---

[2] Defendants urge this Court to discount *Orthoflex* because it is "a case from the northern district of Texas which holds no binding authority on this court." (ECF 187 at 12.) While that is technically true, the case certainly is instructive and useful to this Court.

8

begs the question: what is the method for "conducting an apportionment analysis," particularly when it comes to the stage of Mr. Plumpe's opinion that produces the apportioned profit figure? None of these cases provides *any* method for performing an apportioned profit calculation.

### B.   The Discussions with CargoSprint Owners and Managers Are Not Reliable Evidence to Support Mr. Plumpe's Opinions

As noted above, Defendants argue that Mr. Plumpe's reliance on discussions with CargoSprint's owners and management-level employees is perfectly acceptable, at least in part because PayCargo's rebuttal expert obtained some of the information for his opinion that way. (ECF No. 187 at 10.) The cases they cite do not support Mr. Plumpe's extensive reliance on statements from interested witnesses purporting to prove a wide range of facts, however, including purported customer preferences, PayCargo business practices, and CargoSprint business practices.

Specifically, in *Knight v. Miami-Dade Cnty.,* 856 F.3d 795, 809 (11th Cir. Fla., May 5, 2017), although the court held that "experts are given 'wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation,'" (quoting *United States v. Scrima*, 819 F.2d 996, 1002 (11th Cir. 1987)), the hearsay in that case was very different from the Defendants' statements here. *Knight* involved statements obtained from eyewitnesses to the events at issue, not from persons affiliated with the party who have a clear interest in the outcome. 856 F. 3d at 809. Similarly, Defendants cite *Metal Grp. USA LLC v. Seapack, Inc.* for the proposition that "hearsay statements on which an expert relies must be the type of evidence reasonably relied upon by experts in the particular field forming opinions on the matter." No:18-cv-22639-MORENO/LOUIS, 2019 U.S. Dist. LEXIS 237060 at *16, 2019 WL 11505384 at *6. This statement begs the core question: are the self-interested statements of a party's owners and management "the type of evidence reasonably relied upon by experts in the particular field forming opinions on the matter?" The hearsay in *Metal Grp. USA*, which this Court permitted as the basis of the expert opinion, has little in common with the dozens of generalizations undergirding Mr. Plumpe's opinion. That case involved proffered testimony from the plaintiff's sales employee concerning an offer to purchase industrial spare parts at a specific price. The content of the testimony was memorialized in a sworn affidavit. 2019 WL 11505384 at *2. This Court permitted the testimony to establish the value of the goods in question, because it "reflects [the witness's] first-hand knowledge of an offer to buy the goods in question at a specified price." *Id.* at *6. The statements from CargoSprint's owners and managers do not report their first-hand knowledge of

9

any facts except, perhaps, their own operations (which, in many instances, Mr. Plumpe did not verify by obtaining documentary support.)

## III.     CONCLUSION

Defendants' expert opinions on operating expenses, revenue attribution, and profit apportionment are unreliable. They depend in a significant part on unreliable evidence – the statements of CargoSprint's owners and management – and the purported methodology used to convert the revenue attribution into an apportioned profit figure lacks any support in case law or professional literature. For these reasons, his opinions must be excluded.

Respectfully submitted,

PODHURST ORSECK, P.A.

SunTrust International Center
One S.E. 3rd Avenue, Suite 2300
Miami, Florida 33131
Telephone: (305) 358-2800
Facsimile: (305) 358-2382
Peter Prieto
Florida Bar No. 501492
pprieto@podhurst.com
Matthew Weinshall
Florida Bar No. 84783
mweinshall@podhurst.com
Alissa Del Riego
Florida Bar No. 99742
adelriego@podhurst.com

EVERSHEDS SUTHERLAND (US) LLP
Ann G. Fort (admitted *pro hac vice*)
999 Peachtree St. NE, Suite 2300
Atlanta, GA 30309
Phone: 404-853-8000
Facsimile: 404-853-8806
Email: annfort@eversheds-sutherland.com

Cameron C. Murphy
Florida Bar No. 0125086
999 Peachtree St. NE, Suite 2300
Atlanta, GA 30309
Phone: 404-853-8000
Facsimile: 404-853-8806

        Email: cameronmurphy@eversheds-sutherland.us

        XANDER LAW GROUP, P.A.

        By:*/s/Wayne R. Atkins*
            Wayne R. Atkins
            Florida Bar No. 84000
        One NE 2nd Avenue, Suite 200
        Miami, FL 33132
        Phone: 305-767-2001
        Facsimile: 855-926-3370
        Email: wayne@xanderlaw.com

        *Counsel for PayCargo, LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 14, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify the foregoing document is being served this day on all counsel of record via transmission of Notice of Electronic Filing generated by CM/ECF.

        By  */s/Wayne R. Atkins*
            Wayne R. Atkins

11