## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 1:19-CV-22995-LOUIS

PAYCARGO, LLC,

      Plaintiff,

v.

CARGOSPRINT LLC, and
JOSHUA WOLF, *an individual*

      Defendants.

_____/

### <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

**THIS CAUSE** is before the Court following a five-day bench trial held from June 21, 2021, through June 25, 2021. Closing arguments were heard on July 22, 2021. Pursuant to this Court's Paperless Order (ECF No. 305), the Parties submitted proposed Findings of Fact and Conclusions of Law following the bench trial. Post-trial, Plaintiff's Motion for an Order to Show Cause (ECF No. 300) resulted in the issuance of an Order striking evidence admitted by Defendants to show losses to be considered in the award of any damages. Finally, the record is now complete. The Court has carefully considered the evidence and testimony presented at trial, the Parties' respective submissions, the record in this case, the applicable law, and is otherwise fully advised in the premises. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court sets forth the following findings of fact and conclusions of law.

## I.    <u>RELEVANT BACKGROUND</u>

### a.  **The Parties**

Plaintiff PayCargo, LLC ("PayCargo" or "Plaintiff") is a Delaware limited liability company with a principal place of business in Coral Gables, Florida 33134. Formed in 2008,

1

PayCargo provides an online payment and data management system for the freight and cargo shipping industry, known as the PayCargo System.

The PayCargo System facilitates the release of cargo by allowing payers registered on the PayCargo System to make payments to vendors (typically air and ocean carriers), upon entering data relating to a specific transaction or cargo shipment. The PayCargo System directs funds from a payer's pre-paid account or bank account, and via Automatic Clearing House ("ACH"), payment is electronically transmitted to the vendor within the next business day, so that the cargo may be quickly released.

PayCargo has essentially two types of customers: payers and vendors. PayCargo describes a payer as any entity that needs to pay a vendor for the release of cargo. The majority of payers on the PayCargo System are freight forwarding companies, custom house brokers, importers, exporters, beneficial cargo owners, and companies that own cargo. Vendors are mostly companies that own ocean shipping lines, trucking companies, airlines, railroads, and the companies that help load and unload ships, planes, or trucks and then store the cargo in warehouses or other facilities.

The value of the PayCargo System is its efficiency: as soon as a payer on PayCargo's online system approves a payment, an email alert is generated and sent to the vendor notifying it that the payment has been made for the specific invoice, amount, and other reference information that may flow with the payment, in turn enabling the vendor to release the goods.

PayCargo owns three federal trademarks in connection with the PayCargo System: U.S. Registration No. 3,519,112 (the "'112 Registration"), U.S. Registration No. 3,347,315 (the "'315 Registration"), and U.S. Registration No. 3,900,069 (the "'069 Registration") (collectively, the "PayCargo Marks."), which were registered in 2007, 2008, and 2011, respectively. The PayCargo System has been in use since at least 2009.

PayCargo has invested significantly in marketing its name on social media, industry conferences, phone calls, mass mailings, advertising campaigns, and on-site customer visits and sales calls.  PayCargo markets its services to both payers and vendors.

Defendant CargoSprint is a Georgia limited liability company with a principal place of business at 21 Eastbrook Bend, Suite 202, Peachtree City, Georgia 30269.  Defendant Joshua Wolf is Chief Executive Officer, President, and founder of CargoSprint.  Wolf founded the company on July 5, 2012.

CargoSprint similarly provides services to the freight and cargo shipping industry through an electronic payment platform.  Initially, CargoSprint was known as PayAirCargo, LLC ("PayAirCargo").  PayAirCargo operated by setting up printers near or at airports to deliver paper checks to air carriers on behalf of its payors.

### b.  Relevant Procedural Background

Plaintiff initiated this suit in July of 2019 and asserts claims for infringement of PayCargo's three registered trademarks (Counts I–III); breach of contract (Count IV); unfair competition under both the Lanham Act[1] and Florida law (Counts V & VI).

A preliminary injunction was entered following an evidentiary hearing, enjoining Defendants from using the PayAirCargo name in commerce, ordering transfer of the payaircargo.com name, and ordering preservation of all documents of use of the name in commerce (ECF Nos. 69, 85).  At summary judgment, I denied Defendants' motion and granted Plaintiff's motion with respect to its trademark infringement claims and federal unfair competition claims.  I denied Plaintiff's motion with respect to its claims arising from breach of contract and Florida's unfair competition law.  (ECF No. 267).

---

[1]  15 U.S.C. § 1125(a).

Trial was conducted for the purpose of determining damages on the trademark infringement claims as well as liability on Plaintiff's remaining state law claims.  At the close of Plaintiff's evidence, upon Defendant's motion for judgment as a matter of law, Plaintiff conceded the absence of evidence on its state law unfair competition claim; the motion was granted in light of the lack of opposition (Count VI).  The Court's findings of fact and conclusions of law then focus on Plaintiff's breach of contract claim and entitlement to damages.

## II.   FINDINGS OF FACT

### a.  Liability

Prior to forming PayAirCargo, Defendant Wolf was aware of PayCargo and more specifically, with its business model of expedited payment by ACH.  Wolf was acquainted with the business as a result of a visit from a PayCargo sales representative; he had also used the PayCargo platform as a customer and to see how it worked.  Indeed, he completed a transaction on the PayCArgo system approximately one week before founding his competing company, PayAirCargo.  Not only was Wolf aware of Plaintiff and familiar with its system, he admitted to coveting its name.

By 2013, Wolf was fielding questions about the similarity in his company's name to PayCargo.  A former colleague questioned Wolf why he did not change his company's name to something less similar.  Defendants knew the name caused confusion among customers; at trial, Wolf admitted that many people were confused by the similarity between the two companies' names.  In correspondence to customers, Wolf similarly admitted that a lot of people confused the two companies.

Plaintiff became aware of Defendants sometime before 2015.  In August of 2015, representatives of both companies met.  Plaintiff's motivation to meet was to address the name

4

confusion caused by Defendants.  Both sides contemplated solutions, including a merger, which did not come to fruition.

Following the meeting in August 2015, Defendants continued to receive external communications expressing confusion over whether the two entities were the same.  The internal communications between Defendant's employees in 2016 reveal indifference to the confusion the name was causing.  Rayo Torres, Chief Operating Officer and half shareholder of Defendant, forwarded to a customer support team member an email advanced by a member of Plaintiff's staff, redirecting a customer's question from PayCargo to PayAirCargo.  Torres describes the interaction in her email as "hilarious."  Wolf himself monitored the email account support@payaircargo.com and similarly forwarded and redirected communications from Plaintiff's staff to Jeff Stubblefield, his IT director, and both commented that the incident was funny.

Plaintiff served its first Cease and Desist letter on Defendants in August of 2016, demanding that Defendants immediately cease using the name "PayAirCargo" and any other name confusingly similar to Plaintiff's trademarked name.  The parties again engaged in a series of discussions, culminating in the execution of the Settlement Agreement at issue.

The Settlement Agreement is dated December 2, 2016.  Both parties were represented by counsel during the negotiation of the Agreement, which is governed by Florida law.  The Agreements recites that Plaintiff is the owner of the registered mark "PAYCARGO."  The Agreement further recites that Plaintiff believes Defendants had infringed upon the registered mark through its use of "PayAirCargo," and that Defendant believes it had not infringed; the Settlement Agreement reflected a compromise to this bona fide dispute.

The first Term and Condition set forth in the Settlement Agreement required Defendant to formally change its name from PayAirCargo.  Wolf and all of his related entities agreed to "cease

conducting business using the 'PayAirCargo' name" and to conduct business under a new corporate name.[2]  The name "CargoSprint" was acknowledged by both Parties as an acceptable, non-infringing alternative.[3]  Defendants further agreed not to seek any form of intellectual property protection for the name "PayAirCargo" or similar mark.  Third, Defendants agreed to cease all advertising under the name "PayAirCargo," defining advertising to include use of internet search engines to return results based on a word string that incorporates the infringing name ("pay air cargo").  Fourth, the Agreement required Defendants to immediately cease sending emails from the email address support@payaircargo.com specifically and, more generally, the domain name "payaircargo.com".  By the effective date of January 1, 2017, Defendants were required to establish an auto-response to emails sent to the support email address that would advise the sender of the new corporate name.  The Parties also agreed to the transfer of the domain name to a third party, upon which Defendants would no longer receive or respond to emails sent to the payaircargo domain name.

Fifth, the Parties agreed to a transition period of January 1, 2017 to May 31, 2017, during which time Defendants would announce its name change via an explanatory note on its website directing traffic to the new website.  The Parties agreed that the transfer of the domain name to a third party would occur by no later than July 1, 2017, and the cost associated with the transfer would be shared by the Parties.  The Agreement requires the Parties to agree on the third-party escrow agent, and contemplates a solution in the event that they do not so agree.  Finally, the Agreement required Defendants to cease using PayAirCargo on its invoices by no later than the effective date, "provided that, however, from January 1, 2017 until no later than May 31, 2017,

---

[2] The Settlement Agreement is Plaintiff's Exhibit 110 (ECF No. 296-103).
[3] Sometime before 2016, Wolf began using the name "CargoSprint" on correspondence, but he did not adopt this alternative moniker until and because of the Settlement Agreement.

the invoices may contain an explanatory note regarding the name change, after May 31, 201[7] there will be no reference to PayAirCargo on any invoices." (Pl. Exh. 110).[4]

In exchange, Plaintiff agreed to release Defendants and to not sue Defendants for all claims it could have had prior to execution of the Settlement Agreement, "[c]ontingent upon the faithful completion by the Wolf Entities of their obligations under this Agreement." (*Id.* at 7). Defendants similarly agreed to release Plaintiff from any claim it had or could have had prior to execution of the Settlement Agreement, contingent upon the faithful completion by Plaintiff of its obligations under the Agreement. The Settlement Agreement additionally provides for recovery of reasonable costs, including attorneys' fees, by the prevailing party in any action to enforce the terms of the Agreement. The Settlement Agreement contains a no-oral-modification clause, specifying that any agreement to modify the terms and conditions of the Agreement must be in writing and executed by the Parties.

The essence of the Agreement was for Defendants to cease commercial use of the infringing name "PayAirCargo." The Agreement required far more than for Defendants to change the corporate name from the infringing name, but rather, mandated Defendants to take steps to avoid and even remediate the market confusion that the infringing name had caused by redirecting all traffic from the infringing domain to the new website, announcing the name change, and cessation of receipt or response to communications to the infringing domain name by a date certain.[5] That the essence of the Agreement went beyond Defendants' name change is illustrated by the contingent nature of the release, which is the only performance required by Plaintiff under the contract and is conditioned on Defendants' *completion* of its *obligations* (plural). Defendants

---

[4] The Settlement Agreement identifies May 31, 2016 as the end date for reference to the infringing name; it was without dispute that this is a typo and the end date is in 2017.
[5] In the Order granting Plaintiff's Motion for Summary Judgment, I have already found that Defendant's use of the "PayAirCargo" name infringed on Plaintiff's registered trademarks.

could not fully perform under the Agreement by formally changing the corporate name alone, without taking the affirmative steps required to cease use of the infringing name.

Defendants materially breached the Agreement.  The first breach was identified by Plaintiff around July of 2018, approximately one year after Defendants were to have ceased all use of the PayAirCargo name.  Defendants continued to include the explanatory language on its invoices that "PayAirCargo has evolved!  We are now CargoSprint."  Plaintiff discovered a single example of Defendants' continued inclusion of the explanatory note on the invoices and responded by sending a second cease and desist letter on July 10, 2018.  The letter warns Defendants that this "violation of the settlement agreement [] compromises the covenants to refrain from suing."  (Pl. Exh. 111). Plaintiff demanded that Defendants cease use of the PayAirCargo name and "take whatever proactive measures are necessary to ensure that breaches of the settlement agreement do not continue."  *Id.*  Though Plaintiff asserted its right to initiate litigation at that time, Plaintiff instead sought assurance from Defendants that the problem had been corrected and, to that end, requested explanation of what steps Defendants had taken to ensure there was no continuing problem. Plaintiff offered that Defendants may identify any other documents that might breach the settlement agreement and that with assurances that the breaches were inadvertent, Plaintiff would not then initiate litigation.  Approximately two weeks later, Defendants provided the assurance sought that they had conducted a review and determined that the name was not being used in any fashion.

Between the time Defendants finally ceased inclusion of the infringing name on its invoices and the time they had committed to doing so, Defendant CargoSprint had processed over 455,000 transactions, resulting in the issuance of hundreds of thousands of invoices to its customers that displayed the infringing name.  Customers who received such invoices expressed confusion about

whether the companies were the same or different; one such customer emailed both companies to inquire about a transaction reported on the invoice.  Another customer sent an email expressing her understanding that "PAYCARGO is Cargo Sprint," citing the invoice explanatory note as support.[6]

Defendants continued to send and receive emails at the support@payaircargo.com address as late as December of 2019, a full two years after executing the settlement agreement.  These email alerts were sent to customers to notify them that their payment had been delivered to the vendor or cargo carrier.  Thousands of such emails were sent after the effective date.  Though this use of the infringing name was post-transaction, it perpetuated the confusion among customers as to the separateness of the competitors.

Nor did Defendants set up the required automatic reply to emails sent to the support@payaircargo.com email account advising senders of the new corporate name and email address.  I do not credit the testimony of the witnesses who testified that an automatic reply was set up.

Well after the effective date, the infringing name "PayAirCargo" remained in commercial use by third parties, and Defendants failed to stop or correct them.  Merchant American Express continued to identify "PayAirCargo" on its statements to Defendants' customers until at least March of 2020.  More than 100,000 transactions paid for by American Express resulted in a statement identifying Defendant by the infringing name.  Defendant CargoSprint continued to be registered on the "DockenRoll" system with vendor Lufthansa under the infringing name until after the preliminary injunction was entered in this case.

Defendants' social media presence continued, after the effective date, to display uses of the

---

[6]  This communication occurred during the transitionary period but nonetheless demonstrates confusion in the marketplace caused by Defendants' use of the infringing name, including on its invoices.

infringing name, including Twitter posts that were not removed from the platform until June of 2020; and display of the infringing name on Defendants' Facebook "about" page.  Employees of Defendants continued to include in their email signature block a link to the PayAirCargo LinkedIn page, though the infringing name would be visible only in the metadata or HTML address of the page.  Other employees used the infringing name in correspondence with customers, regarding invoices payable to "PayAirCargo," as late as July 2019.

I do not find these examples of Defendants' use of the infringing name in commerce were mere technical violations of the Settlement Agreement and Defendants' obligation to cease all use of the name.  Rather, I find the persistent ongoing use of the infringing name materially breached the Settlement Agreement.  I also find these violations were not excusable or inadvertent but were attributable to the Defendants' failure to adequately investigate and ascertain the numerous ways in which the name appeared in the market and to remove or change the name used by Defendants and others to identify Defendant CargoSprint in commerce; as well as their breach of agreement to set up an automatic reply to emails sent to support@payaircargo.com.

Defendants' use of the infringing name in violation of the Settlement Agreement harmed Plaintiff.  Customers and vendors alike expressed confusion over whether the two competitors were a single entity.  Plaintiff's reputation and brand was diminished by customers' mistaken conflation of the two companies.  Plaintiff's employees dedicated a not insubstantial amount of time redirecting communications intended for CargoSprint and expended extra resources in marketing attributable to educating the market about the separateness of the two companies.  And of course, Plaintiff invested substantial energies in pursuing Defendants' compliance with the Agreement.

10

### b. Damages

From inception through 2020, Defendant CargoSprint earned approximately $23 million in net fee revenue, according to the accountants who testified on behalf of both sides.  I accept the accounting performed by Plaintiff's expert Barry Mukamal and the revenue he has attributed to distinct periods of time: pre-Settlement Agreement (June 13, 2012 to December 2, 2016); the transition period, during which time Defendants were permitted limited use of the infringing name (December 3, 2016 to May 31, 2017);[7] post-Settlement Agreement infringement, up to Plaintiff's second cease and desist and Defendants' acknowledgement thereof (June 1, 2017 to July 16, 2018); and the final period of time up to November 21, 2020.

I accept Mr. Mukamal's determination that approximately $20 million of Defendants' net revenue was derived from customers acquired before Defendants entered into the Settlement Agreement and changed the corporate name.  I also accept Mr. Mukamal's determination, after review of all available records kept by Defendants, that the costs reasonably ascertainable and attributable to the infringing business is $4,920,538.[8]

## III.   CONCLUSIONS OF LAW

Under Florida law, the elements of a breach of contract claim are: "(1) the existence of a contract, (2) a breach of the contract, and (3) damages resulting from the breach."  *Rollins, Inc. v. Butland*, 951 So. 2d 860, 876 (Fla. 2d DCA 2006).  "In addition, in order to maintain an action for breach of contract, a claimant must also prove performance of its obligations under the contract or a legal excuse for its nonperformance."  *Id.*  Under Florida law, the question of whether a valid

---

[7]  Plaintiff seeks no award of disgorgement of profits derived from this period.
[8]  I have excluded Defendants' evidence pertaining to costs as a sanction.  Had I not excluded it, I would not have accepted the evidence as reliable.  The largest cost Defendants seek to deduct is wages purportedly paid to an entity related to Defendants lacking supporting business records to corroborate the expenses claimed.  The invoices advanced at trial bore a date that had no relationship to the services rendered and, as more fully explained in my Second Order of Contempt (ECF No. 353), Defendant Wolf and his ex-wife altered the documents that were presented for use in this litigation.  Defendants fell quite short of meeting their burden of proving their deductible costs.

11

contract exists is a threshold question of law that may be properly decided by the court. *Kolodziej v. Mason*, 774 F.3d 736, 740 (11th Cir. 2014). The Settlement Agreement constitutes a valid, enforceable contract between these Parties.

Whether Defendants' continued use of the infringing name under the circumstances constitutes a material breach of the Settlement Agreement is a question of fact to be determined by the trier of fact. *See Hall of Fame Assocs. v. 550 Seabreeze Dev., LLC*, No. 08-60043-CIV, 2008 WL 11331652, at *2 (S.D. Fla. Sept. 11, 2008). As set forth above, I do find the breaches were material. In addition to the enumerated findings above, I consider the testimony of Defendant Wolf that when Defendants became aware of the post-Settlement Agreement uses of the infringing name, they corrected it. Implicit here is his acknowledgement that he was required to do so, under the Settlement Agreement. From this, I think it is clear that the Parties to the Settlement Agreement mutually understood that the essence of the agreement was cessation of all uses of the infringing name, not merely, as Defendants now argue, a formal change of the corporate Defendant's name.

I further find that Defendants' material breaches of the Settlement Agreement relieved Plaintiff of any further duty to perform under the Agreement. *Hamilton v. Suntrust Mortg., Inc.*, 6 F. Supp. 3d 1300, 1309 (S.D. Fla. 2014). Plaintiff had, until 2019, withheld from litigation for Defendants' trademark infringement. That Plaintiff elected not to sue in 2018 when Defendants' first breach of the Agreement was discovered does not change this conclusion.

There was no accord and satisfaction with respect to CargoSprint invoices bearing the PayAirCargo name sent out between June 1, 2017 and July 25, 2018. Defendants' affirmative defense here would require proof of an offer, acceptance, and consideration. *See Air Prod. & Chemicals, Inc. v. Louisiana Land & Expl. Co.*, 806 F.2d 1524, 1529 (11th Cir. 1986) (citing 10 Fla. Jur. 2d Compromise, Accord, and Release § 4 (1979)). At summary judgment, I found

Defendants' proffered evidence lacking to prove its entitlement to judgment on this affirmative defense, primarily because the evidence did not show a meeting of the minds; what Defendants argued they were required to do was substantially different than what Plaintiff demanded of Defendants in the letter.  At trial, no additional evidence was advanced and I find no accord and satisfaction from Defendants' performance on the second cease and desist letter.

I find that Plaintiff was substantially injured by Defendants' material breaches of the Settlement Agreement.  Though Plaintiff advanced no evidence of a specific amount of monetary damages it seeks to recoup on this claim for breach of contract, that does not preclude my finding that, in fact, Plaintiff was injured.[9]  *See Healix Infusion Therapy, Inc. v. Helix Health, LLC*, 747 F. Supp. 2d 730, 738 (S.D. Tex. 2010).  Plaintiff's representatives testified credibly about the disruption in Plaintiff's business, including resources diverted to overcoming the market confusion caused by Defendants' use of the infringing name in violation of the Settlement Agreement. Plaintiff bargained for cessation of the name use without resorting to the uncertainty and expense of litigation, and Defendants' failure to comply with its obligations deprived Plaintiff of that benefit.  Moreover, Defendants' violations of the Settlement Agreement also constituted trademark infringement, that caused actual confusion, for which the law recognizes irreparable harm to Plaintiff.  *See Popular Bank of Florida v. Banco Popular de Puerto Rico*, 9 F. Supp. 2d 1347, 1363 (S.D. Fla. 1998).  I reject Defendants' argument that the Plaintiff was not injured by the *de minimis* violations that occurred, but rather, conclude from the evidence presented that the persistent market use of the infringing name, even in post-transaction communications like the invoices, perpetuated the actual confusion in the market to Plaintiff's detriment.

In sum, I find that Plaintiff has proven its claim in Count IV for Breach of Contract by a

---

[9]  Plaintiff has foreshadowed its intention to seek recovery of its reasonable costs, including fees, should it prevail, pursuant to the Settlement Agreement.

preponderance of the evidence.

## IV.   **DAMAGES**

As noted above, Plaintiff seeks no monetary recovery based on its breach of contract claim and advanced no evidence to support such an award.  The Court considers the law applicable to an award of damages pursuant to Plaintiff's claims arising under the Lanham Act.

The Lanham Act allows a plaintiff to recover the defendant's profits as an equitable remedy.  *Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, 921 F.3d 1343, 1352–53 (11th Cir. 2019); 15 U.S.C. § 1117.  The "Act permits recovery of profits because actual damages are often difficult to prove."  *Id.* at 1353.  It thus "shifts the burden of proving economic injury off the innocent party, and places the hardship of disproving economic gain onto the infringer."  *Id.* at 1353–54.  Courts, guided by principles of equity, disgorge an infringing defendant's profits to "mak[e] infringement unprofitable."  *Burger King Corp. v. Mason*, 855 F.2d 779, 781 (11th Cir. 1998).  In the Eleventh Circuit, an award of defendant's infringing profits under the Lanham Act is appropriate "where (1) [the] defendant has deliberately and willfully infringed a mark, (2) the defendant was unjustly enriched, or (3) the sanction is necessary for future deterrence."  *PODS Enter., LLC v. U-Haul Int'l, Inc.*, 126 F. Supp. 3d 1263, 1281 (M.D. Fla. 2015) (emphasis added) (citing *Howard Johnson Co., Inc. v. Khimani*, 892 F.2d 1512, 1521 (11th Cir. 1990)).

I have little difficulty concluding that the infringement by Defendants was willful.  Wolf personally acknowledged the similarity of the names, the commercial desirability of Plaintiff's name, and long after the actual confusion and detriment was made known to him, he continued to use and perpetuate the use of the infringing name.  Moreover, he was responsible for eliminating the corporate defendant's use of the infringing name and failed to take even the steps he agreed to take to remediate its use, for example, setting up an automatic response to emails sent to

14

support@payaircargo.com.[10]   Indeed, the evidence is sufficient for me to additionally find that Defendants capitalized on the misdirected email traffic and exploited contact with would-be customers to market their own services.   Because each actively and willfully infringed on Plaintiff's trademarks, each of the Defendants is jointly and severally liable to the Plaintiff.   *See Jackson v. Grupo Indus. Hotelero, S.A.*, No. 07-22046-CIV, 2009 WL 8634834, at *10 (S.D. Fla. Apr. 29, 2009) (citing *Babbit Elecs. v. Dynascan Corp.*, 38 F.3d 1161, 1184 (11th Cir. 1994)).

I further find that an award of disgorgement of profits is warranted here for deterrent purposes.   Nothing else has been sufficient to garner Defendants' required attention to cease *all* uses of the infringing name.

Finally, with respect to proving what costs should be deducted from any award, Defendants failed to adduce competent documentary evidence of costs actually incurred and paid.   I have excluded Defendant's evidence of costs as a sanction, and alternatively, will not rely on the expert testimony advanced by Plaintiff's expert Plumpe, which lacked sufficient evidentiary support with regard to costs.   Yet as noted above, I recognize there were certainly some costs associated with Defendants' business operations.   *Nutrivida, Inc. v. Inmuno Vital, Inc.*, 46 F. Supp. 2d 1310, 1316 (S.D. Fla. 1998) (estimating deductible costs where evidence failed to substantiate claimed costs). I will adopt Mr. Mukamal's calculation of Defendants' costs, which I find reliable and supported by substantial evidence.

An award of disgorgement may apportion profits attributable to the infringement and deduct those that are not related to the infringement.   Defendants bear the burden of proof in demonstrating those profits not attributable to the infringement.   *See Pandora Jewelers 1995, Inc.*

---

[10]  I do not credit the testimony that was offered to the contrary that such an auto-reply was created.   There were no such emails introduced into evidence and according to other evidence, Defendants' retention policy would not explain the destruction of all auto-reply emails, if they had in fact existed.

*v. Pandora Jewelry, LLC*, No. 09-61490-CIV, 2011 WL 2295269, at *4 (S.D. Fla. June 8, 2011). Both sides propose damage calculations premised on the time periods delineated by Mr. Mukamal, described above, and seek apportionment based on facts unique to each period.

Beginning with the first period, I find the net revenue to be disgorged is $1,355,024. This amount considers (and deducts) direct operating costs of $303,176. I do not find, as Defendants urge, that by seeking to enforce the Settlement Agreement, Plaintiff is required to abide by its release of any claims for infringement arising before the Settlement Agreement. The release was expressly conditioned on Defendants' faithful completion of their obligations under the Agreement, and their material breaches relieves Plaintiff of its promise not to sue (or seek damages for) pre-Settlement Agreement infringement. Defendants' argument—that this action to enforce the Settlement Agreement seeks specific performance and that in granting the relief, this Court can put the Parties back to the position they would have enjoyed if both performed—ignores the language of the Settlement Agreement and the reality that Plaintiff had to sue to get to this point.

No profits earned during the transition period will be disgorged because Defendants were authorized during that time to use the infringing name, in limited capacity. Plaintiff urges the Court to disgorge profits earned during that time from customers *acquired* during the pre-Settlement Agreement period because acquisition of those customers is attributable to Defendants' infringement. This was a consequence Plaintiff accepted when negotiating the limited license for use of the name during the transition period—that Defendants would keep existing customers and migrate them to the new corporate name. I find it would be inequitable to disgorge Defendants' profits during this period of authorized use and will not include it in my award.

I will award a total of $3,841,040 in profits realized after the transition period, when Defendants continued to display the infringing name on its invoices until July of 2018. Defendants

urge the Court to find these profits are not attributable to their infringement because the communications displaying the infringing name would be transmitted only *after* the recipient became a customer; from this, Defendants would have the Court find that the sale is not attributable to Defendants' infringement.  I do not find that Defendants have carried their burden to show that the reasons for these customers' transactions were not attributable to their infringement.  Nor do I deduce from the circumstances that it must be so, in light of the overwhelming evidence of actual confusion in the market, including confusion directly attributable to the explanatory note on the invoices at issue.  Finally, I do not credit the opinion offered by Defendants' expert on apportionment, which was not substantiated by competent evidence.  I found the rebuttal testimony offered by Plaintiff's expert Dan Cenatempo credible and extremely helpful in appreciating the deficiencies in Plumbe's apportionment opinion.

In the final "continued infringement" period, after Defendants removed the explanatory note from their invoices, the appearance of the infringing name was minimal.  As noted above, Defendants' failure to cease *all* use of the name deprived Plaintiff of the benefit of the Settlement Agreement and constitutes a material breach thereof.  For purposes of determining the amount of profits to be disgorged from Defendants' *infringement* during this time period, I recognize that infringement occurred, but under limited circumstances.  While the Court might have the discretion under the Lanham Act to award Plaintiff all of the profits earned during this continuing infringing period, in the exercise of its discretion, given that the profits are overwhelmingly attributable to factors other than the limited use of the infringing name during this time, I find that such an award would be inequitable.  *See Jackson*, 2009 WL 8634834, at *14.

For the final period of infringement, I find the amount to be disgorged is $6,395,213.50.  I arrive at this number by starting with the net profits, as calculated by Mr. Mukamal, of $13,876,426

and subtracting therefrom the profits attributable to new customers who received statements from American Express bearing the infringing name ($222,303).   Plaintiff's expert identified transactions attributable to the customers acquired by Defendants after they ceased sending out invoices with the infringing name, and whose only exposure to the infringement would have been through their billing statements from American Express.  I do agree with Plaintiff's contention that the Court not apportion these transactions to the disgorgement award.  Similarly, I have reduced the profits realized after October 1, 2020, the latest date the evidence shows Defendants used the infringing name ($863,696). Defendants' net revenue for this period for which Plaintiff accordingly seeks disgorgement is $12,790,427.

It is notable that the revenue for this two-year period is nearly three times as much as that realized during the prior time period, June 2017 to July 2018, and for purposes of this dispute, the only change in circumstances is the cessation of Defendants' inclusion of the infringing name on its invoices—thereby ending the last of its uses of the infringing name on a generalized basis in communications with customers.  CargoSprint had, by the end of the period of infringing invoices in July 2018, expended efforts to develop its name in the market.  The significant increase in revenue realized by CargoSprint during that time demonstrates some proportionate increase in its customer base, not acquired using the infringing name.   In the final period of continuing infringement, the use of the infringing name in the market was isolated and relatively obscure, as opposed to the flagrant and pervasive infringement that occurred in prior periods.  That is to say— the uses by Defendants, or permitted by Defendants' inaction, violated the Parties Settlement Agreement, but was not a driving force behind the sales occurring during this time.  Rather, the limited use of the infringing name minimally contributed to the generation of profits.

I am mindful that when a precise accounting of profits is not possible, any uncertainty

should be determined in the innocent party's favor, not the infringer's.  Here, however, I find from all of the evidence that Defendants' profits during the final period of infringement, after July 2018, are more likely attributable to factors other than Defendants' infringing use of the name.  I thus conclude that it would be unjust and punitive to award the total of Defendants' profits from this time.  Taking all of this into account, I find it would be inequitable to award Plaintiff no portion of Defendants' profits, but similarly inequitable to afford more than half of its profits from this time.

The sum total of the award is $11,591,277.50.

Prejudgment Interest

In Lanham Act cases, prejudgment interest is available in the Court's discretion to successful plaintiffs.  *See Nutrivida, Inc. v. Inmuno Vital, Inc.*, 46 F. Supp. 2d 1310, 1317 (S.D. Fla. 1998) (citing *Gorenstein Enterprises, Inc. v. Quality Care–USA, Inc.*, 874 F.2d 431, 437 (7th Cir. 1989)).  Courts have awarded prejudgment interest for statutory damages where the infringing activity was willful and deliberate.  *Chanel, Inc. v. Villalobos*, 10-60054-CIV, 2011 WL 13217003, at *5 (S.D. Fla. June 20, 2011).  Plaintiff seeks a determination that it is entitled to prejudgment interest.  This issue was not raised during trial and indeed, Plaintiff's Proposed Findings of Fact and Conclusions of Law note the need to explore, in post-judgment briefing, the rate of any such interest to be applied.  The Court will reserve jurisdiction on this issue and request briefing by the Parties on prejudgment interest, specifically, the date from which prejudgment interest should be calculated and at what rate.

Attorneys' Fees

Plaintiff seeks an award of attorneys' fees under the Lanham Act, which provides for such an award in "exceptional cases."  15 U.S.C. § 1117.  Intentional, deliberate or willful conduct is

usually sufficient to make out an "exceptional case." *See, e.g.*, *Nutrivida, Inc. v. Inmuno Vital, Inc.*, 46 F. Supp. 2d 1310, 1318 (S.D. Fla. 1998) (citing *Playboy Enterprises, Inc. v. P.K. Sorren Export Co.*, 546 F. Supp. 987, 999 (S.D. Fla. 1982)).

Defendants continued to use the infringing name for almost *four years* after Plaintiff demanded that they cease the infringement Defendants contractually bound themselves to do. Defendants opposed entry of a preliminary injunction in this case, putting Plaintiff to its burden of proof at that time.  Thereafter, Defendants violated the preliminary injunction and *twice* found themselves in contempt of this Court.  The infringement was willful, pervasive, and relentless for several years.  This qualifies as an exceptional case and Plaintiff is entitled to an award of its attorneys' fees. *Suzuki Motor Corp. v. Jiujiang Hison Motor Boat Mfg. Co., Ltd.*, No. 1:12-CV-20626, 2012 WL 2873733, at *15 (S.D. Fla. June 29, 2012), *judgment entered*, No. 1:12-CV-20626, 2012 WL 2873727 (S.D. Fla. June 29, 2012).  The amount will be determined by separate order, after post-judgment briefing by the Parties

## V.    <u>CONCLUSION</u>

For the foregoing reasons, I find in favor of Plaintiff and against Defendants on Count IV (breach of contract).[11]

I further find that on Counts I, II, III and V, Plaintiff is entitled to damages in the amount of $11,591,277.50.  The Court retains jurisdiction over this action in order to determine the reasonable attorney's fees in this case as well as prejudgment interest.

Within **thirty (30) days** of this Order, the opposing sides shall both file supplemental memoranda of law in support of their position regarding what interest rate should apply in determining prejudgment interest.  Each side's supplemental memorandum shall include a step-

---

[11]  As noted earlier, the motion for judgment as a matter of law as to Count VI (unfair competition) was granted.

by-step calculation arriving at the interest rate advanced, and identify the date from which interest is to be calculated.

Within **thirty (30) days** of this Order, Plaintiff shall file a supplemental memorandum, attaching documentation in support of its reasonable attorneys' fees incurred in this action. The Parties are expected to fully comply with Local Rule 7.3. Defendants may file a response no later than **fourteen (14) days** after Plaintiff files its memorandum in support of its fee demand.

The Clerk of Court is **INSTRUCTED** to **CLOSE** this case. Pursuant to Rule 58 of the Federal Rules of Civil Procedure, Final Judgment shall follow by separate Order.

**DONE AND ORDERED** in Chambers in Miami, Florida, this 30th day of September, 2022.

_____
LAUREN F. LOUIS
UNITED STATES MAGISTRATE JUDGE


cc:     Counsel of Record